**James Edward HOLMES, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 284S64.**

Supreme Court of Indiana.

July 29, 1985.

John R. Kouris, Hammond, for appellant.

Linley E. Pearson, Atty. Gen., Lee Cloyd, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

Appellant was convicted by a jury of Voluntary Manslaughter. He was sentenced to eleven (11) years of imprisonment.

The facts are: On the evening of January 21, 1981, the decedent, James Grey, accompanied Shirley Ford to the home of her sisters. There he met the sisters, Theresa and Willie Stanback, and appellant, who was Theresa's boyfriend. After visiting for a few minutes, Grey, Ford and the Stanback sisters left in Grey's automobile. They first drove Ford to her home where she left the group.

The trio then drove in the direction of a nearby liquor store. From her vantage point in the backseat, Willie saw appellant's automobile following closely behind Grey's automobile. When Grey drove into the parking lot of a service station, appellant parked in the lot of the liquor store which was across the street. After making his purchases at the service station, Grey drove to the liquor store. After Grey had parked his automobile, appellant parked his vehicle in the adjacent parking space. As Grey attempted to start his automobile following his exit from the liquor store, an unidentified voice shouted a word of warning and a shot was heard. The bullet entered the driver's side window and mortally wounded Grey. Appellant's vehicle was seen fleeing the scene immediately after the incident.

Later that evening Theresa Stanback was hospitalized for shock. She was hospitalized for several weeks. As a result of the shock, she had no recall of the events which transpired after the shot was fired.

Immediately after the incident the Stanback sisters entered the liquor store and called Ford. Willie testified Theresa placed the call and was the first to talk. Willie then took control of the telephone. Ford testified that when she first began to listen to the conversation she heard one of her sisters repeatedly shouting, "James shot James." Ford could not identify which sister was speaking. Willie testified as to her statements to Ford which did not include this phrase. Willie indicated she did not remember what Theresa said in the conversation. As indicated above, Theresa could not remember the telephone conversation.

After placing the call the sisters returned to the scene of the incident. By this time the police and medical personnel had arrived. Theresa was now nearly hysterical and was attempting to force her way to the side of the victim. One of the police officers who attempted to restrain her was Officer Gore. He testified Theresa re-

peatedly said, "He didn't have to shoot him; he didn't have to shoot him." Gore then asked Theresa several times who was the assailant. Eventually she indicated the assailant was her boyfriend, James Holmes, the appellant. At trial Theresa had no recollection of this conversation with the police.

Appellant contends the trial court erred when it admitted the hearsay testimony of Ford and Gore as to statements made by Theresa on the night of the incident. The court conducted an *in camera* on the record hearing prior to trial on the admissibility of the Ford and Gore testimony. The court determined the testimony fell within the excited utterance exception to the hearsay rule.

In *Gye v. State* (1982), Ind., 441 N.E.2d 436, this Court summarized the law in this area.

"The rule permitting a spontaneous declaration to be admitted into evidence, as an exception to the hearsay rule, is based upon the rationale that such a declaration from one who has recently suffered an overpowering experience is likely to be truthful. Such evidence is limited to declarations created by, or emanating from the litigated act, and near in time thereto so as to exclude the possibility that they were the product of premeditation or design. The length of elapsed time between when the declarations were uttered and when the occurrence took place is only one element to be considered in determining their spontaneity. Similarly, that the statements were made in response to inquiries is also only one factor to be considered." *Id.* at 437.

Appellant attacks the application of the exception on three grounds. First, he contends the statements were not made contemporaneously with the incident. Secondly, the statements were not made by a victim or by a witness who was physically injured by the incident. Lastly, he claims Theresa's statement to the police officer was not an utterance but rather was a response to police interrogation. He ar-

gues these factors, taken together, negate the conclusion that these were statements in which the possibility of premeditation and design had been excluded.

■ There is no requirement that the event and the utterance be absolutely contemporaneous. Rather, under *Gye*, lapse of time is a factor to consider in determining the application of the exception. The amount of elapsed time between the incident and the utterance weighs in determining the ability of the witness to regain his or her composure and engage in reflective thought. *See C. McCormick, Evidence* § 297 (3rd ed. 1984).

■ In the case at bar Theresa's statement to Ford was made within moments of the incident and clearly falls within the exception. The time frame for the statement to Officer Gore is not clear from the record. However, the testimony indicates that the statement was made while the emergency medical personnel continued to work with Grey prior to his transportation to the hospital. The evidence indicates that Theresa was emotionally distraught during this time. Based upon the continuing excitement of the medical emergency and Theresa's emotional condition, the court did not abuse its discretion when it admitted the statement made to Gore.

■ We do not accept appellant's assertion that the exception applies only to two classes: victims and bystanders who either suffered physical injury or uttered the statement contemporaneously to the incident. The statement need not be made by the victim. *See Watkins v. State* (1983), Ind., 446 N.E.2d 949 and *Ferrier v. State* (1977), 266 Ind. 117, 361 N.E.2d 150. We find no reason to impose on the bystander witness additional requirements as to time or injury in order to qualify his or her statement under the exception. For so long as the incident produces in the witness a level of excitement which prevents the witness from fabricating testimony, we will treat the bystander witness in the same manner as the victim witness.

As to appellant's third assertion that it was not an utterance but a reply to police interrogation, we also find no abuse of discretion. As we indicated in *Gye,* one factor to consider in evaluating the spontaneity of the utterance is whether the statement is in response to inquiries. This Court has upheld the admission, under this exception, of statements made by a victim to inquiries made by a police officer at the scene of the incident. *Walker v. State* (1976), 265 Ind. 8, 349 N.E.2d 161. We find no abuse of discretion in admitting the statement made to Officer Gore.

Appellant next argues the court erred when it admitted as substantive evidence a written statement Willie Stanback gave the police. Willie was called by the State. During her direct examination she testified as follows:

"Q. Did you tell the Police what you knew about what had happened?

A. Yes, I told them.

Q. When the shot went off, that you heard, did you see who fired that shot?

A. No.

Q. Did you tell the Police that you saw who had fired that shot?

BY MR. JABLONSKI:

Objection, leading. It is leading and suggestive.

BY MR. PAGE:

That is fine, I will impeach the other way.

Q. Have you ever said otherwise?

\*　\*　\*　\*　\*　\*

Q. Have you ever said that you did see who shot James Grey?

A. No, I don't think so.

Q. Did you see where James Holmes was when the shot was fired?

A. No, not when it was fired.

Q. Have you ever said otherwise?

A. No, I don't think so.

Q. When you went to the police station that night do you remember them asking you questions and you giving answers?

A. Yes.

\*　\*　\*　\*　\*　\*

BY MR. PAGE:

Q. I would ask you to look at the two (2) page document that I put in front of you and ask you if you have seen that before?

A. Yes.

Q. And does it bear your signature?

A. Yes.

Q. And is that a true and accurate copy of the statement that you gave to the Police that evening?

A. You said is it true and accurate?

Q. Did you sign that, is that an accurate copy of what you signed?

A. Yes.

Q. And drawing your attention to this question and answer. I would ask you to read them to yourself quietly. Do you remember being asked the question and giving that answer?

A. I guess I did give it.

Q. Did you see James Edward Holmes shoot James Grey?

A. No.

Q. Did you see where he was standing when the shot was fired?

A. No.

Q. Do you remember telling the Police that you saw him at the car?

A. I remember from just reading it right now.

BY MR. JABLONSKI:

I'm going to make an objection. I don't think it says that in the statement. Did she ever say she saw him?

BY THE COURT:

Read the exact question and answer.

BY MR. PAGE:

Q. 'Did you see James Edward Holmes shoot James Grey,' and do you remember answering, 'I saw him come to the car and I heard the shot. Someone told me to duck and I did. I didn't see him shoot the gun but he was the only one at the car.'

A. Do I remember saying that?

Q. Yes.

A. I don't think so.

Q. Is your memory of what took place on January twenty-first faded at all in the last three (3) years?

A. Is it faded?

Q. Yes.

A. Not all of it.

Q. I'm sorry?

A. Not all of it.·

Q. Do you remember, well do you remember what James Holmes was wearing that night?

A. When we left the house he had on a white sweater and some blue jeans.

Q. Do you remember what side of the car James Holmes was on when the shot was fired?

A. I didn't see him when the shot was fired.

Q. Do you remember being asked this question and giving this answer? Question, 'Which side of the car did James Holmes come up to when he shot James Grey?' Answer, 'He came up to the driver's side, the window was closed and he shot through the window.'

A. The window was closed.

BY THE COURT:

The question was do you remember making that statement?

A. Making the statement?

BY MR. PAGE:

Q. You do not?

A. No."

Later in the State's case the statement was admitted as substantive evidence under the rule in *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482.

■ Appellant raises a two-pronged attack to the admission of the statement as substantive evidence. First, he contends the statement was used in substitution for available in-court testimony. He cites *Lewis v. State* (1982), Ind., 440 N.E.2d 1125 for the following.

"What we will not permit is for the State to put in substantive evidence of the witness-declarant's version of the fact solely through the admission of the witness' prior statement under the pretext of the *Patterson* rule. At some point the State must put the declarant of the prior statement on the witness stand and elicit direct testimony as to the facts at issue." *Id.* at 1130.

Appellant contends the statement was used as a substitution for the available in-court testimony of Willie Stanback. Secondly, he cites *Watkins v. State* (1983), Ind., 446 N.E.2d 949 for the related proposition that when a witness, who is also the out-of-court declarant, denies making the out-of-court statement or denies having any memory of making the statement, then the statement is inadmissible as substantive evidence. The rationale of the rule is that under these circumstances there can be no meaningful cross-examination of the statement. Appellant argues the in-court testimony of Willie Stanback constituted either a denial of having made the statement or a lack of memory as to the statement.

As to appellant's first issue, we find no merit. The statement was not in lieu of the testimony of Willie Stanback but rather was in addition to that testimony. The State did, as we mandated in *Lewis*, place the out-of-court declarant on the stand and subject her to direct examination on the issues.

Appellant's second issue is resolved by *Watkins*. We noted there that the trial court is to resolve questions concerning whether a particular witness has in fact denied the making of the statement or has asserted a loss of memory as to the statement. We indicated in *Watkins* that the trial court was not to look merely at isolated bits and pieces of testimony but rather was to base its judgment on the total testimony of the witness. In the case at bar Willie Stanback testified that the exhibit containing the alleged statement was a true and accurate copy of her statement and that it bore her signature. In response to questions concerning the statement,

Stanback gave conflicting testimony. She indicated she did not remember making one statement; as to another, she testified she did not think she had made that statement; and as to a third, she stated she guessed she had made that statement. Willie Stanback also gave the following testimony.

"Q. When you were interviewed by the Police did you tell them the truth?

A. I think so.

Q. Are you saying now that you do not remember these things or that they did not happen?

A. I am saying I'm not actually sure what happened."

The trial court properly reviewed the testimony of Willie Stanback and concluded she was not denying or questioning the giving of the statement. Rather she was presently questioning her observations at the time of the incident. The trial court properly admitted the statement as substantive evidence.

Lastly, appellant contends there was a lack of substantive evidence to support the verdict. This argument is premised upon the exclusion of the evidence at issue in the other arguments. Based upon our holdings above, we find sufficient evidence of probative value to support the verdict.

The trial court is in all things affirmed.

All Justices concur except HUNTER, J., not participating.